IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHERRI S. HERNDON, | ) | CASE NO. 1:20-CV-00885-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| vs. | ) | JONATHAN D. GREENBERG |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | **MEMORANDUM OF OPINION AND ORDER** |
| | ) | |
| Defendant, | ) | |
| | ) | |

Plaintiff, Cherri S. Herndon ("Plaintiff" or "Herndon"), challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.     PROCEDURAL HISTORY

In May 2017, Herndon filed an application for SSI, alleging a disability onset date of March 9, 2000 and claiming she was disabled due to depression, anxiety, schizoaffective disorder, developmental disability, and unspecified mood disorder.  (Transcript ("Tr.") at 15, 75-76.)  The applications were denied initially and upon reconsideration, and Herndon requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 15.)

On October 31, 2018, an ALJ held a hearing, during which Herndon, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On January 30, 2019, the ALJ issued a written

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

decision finding Plaintiff was not disabled.  (*Id.* at 15-33.)  The ALJ's decision became final on March 3, 2020, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On April 23, 2020, Herndon filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 15-16, 18.)  Herndon asserts the following assignments of error:

(1) The ALJ committed harmful error when he failed to properly evaluate the evidence in this matter.

(2) The ALJ committed harmful error when he did not meet his burden at Step Five of the Sequential Evaluation.

(Doc. No. 15 at 1.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Herndon was born in March 1983 and was 35 years-old at the time of her administrative hearing (Tr. 31), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 416.963(c). She has a limited education and is able to communicate in English.  (Tr. 31.)  She has no past relevant work.  (*Id.*)

### B.    Relevant Medical Evidence[2]

On March 24, 2017, Herndon went to the emergency room with complaints of blood in her stool the day before.  (*Id.* at 263.)  On examination, treatment providers found Herndon alert, fully oriented, with a normal mood and affect, and she was of no apparent risk to herself or others.  (*Id.* at 264.)

On February 23, 2017, Herndon underwent a psychiatric evaluation at The Center for Families and

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  As Herndon does not challenge the ALJ's physical RFC findings, the Court further limits its discussion to evidence regarding Herndon's mental impairments.

Children.  (*Id.* at 236-240.)  Herndon reported taking seven different medications, none of which worked, as she still saw and heard things and was depressed a lot.  (*Id.* at 236.)  Herndon stated she saw the devil and heard whispers to hurt herself or others.  (*Id.*)  Herndon endorsed auditory and visual hallucinations, depression, isolation, lack of motivation, crying spells, feelings of hopelessness and worthlessness, suicidal ideation with no intent, irritability, anxiety, pacing, restlessness, and rumination.  (*Id.*)  Herndon reported her sleep was sometimes good, and she slept well with Ambien.  (*Id.*)  Based on Herndon's reported symptoms, Elizabeth Petitt, NP, diagnosed Herndon with schizoaffective disorder, depressive type, major depressive disorder, recurrent, moderate, and anxiety disorder, unspecified.  (*Id.*)

On examination, Petitt found Herndon alert and oriented, she could verbalize needs and wants, and her speech was slow and purposeful at times.  (*Id.*)

On March 16, 2017, Herndon saw Petitt for follow up.  (*Id.* at 246.)  Herndon reported she was okay but complained of being bored and having nothing to do.  (*Id.*)  Herndon told Petitt her appetite was good, her weight was stable, and she had been sleeping well.  (*Id.*)  Herndon denied any hallucinations but told Petitt she saw the devil on and off during the day.  (*Id.*)  Herndon denied suicidal and homicidal ideation, outbursts, anger, aggression, violence, and mood swings.  (*Id.*)  Herndon further denied anxiety and told Petitt she was unsure whether she was depressed or just bored.  (*Id.*)  Herndon reported she was homeless, couch surfed, and was currently staying with a friend.  (*Id.*)  Herndon told Petitt she had sufficient refills of her medication, was no longer taking Wellbutrin and Lithium, only took Geodon, and took Ambien "'some times.'"  (*Id.* at 247.)  Petitt found Herndon had made "some progress."  (*Id.*)

On March 30, 2017, Herndon was admitted to the Lutheran Hospital psychiatric unit for depression and suicidal ideation.  (*Id.* at 268.)  Herndon's case worker brought her in after Herndon reported she had been having suicidal thoughts, hearing voices, and seeing the devil.  (*Id.* at 269.)  Herndon told treatment providers she had been "feeling extremely depressed" and hopeless and did not want to do anything but

3

sleep.  (*Id.* at 268.)  Herndon admitted to smoking marijuana daily, and her toxicology screen was positive.  (*Id.* at 268, 273.)  On examination that day, treatment providers found Herndon had a flat affect and appeared "internally stimulated at times."  (*Id.* at 271.)  Later that day, Herndon reported she always feels suicidal, and although she did not have a specific plan, she listed several things she could possibly do.  (*Id.* at 272.)  Herndon also reported being paranoid and seeing devils and ghosts.  (*Id.*)  Herndon told treatment providers she had been hearing things for the past six months, but her visual hallucinations started before 2014.  (*Id.* at 273.)  Herndon expressed she wanted to start medication to stop hearing and seeing things.  (*Id.* at 272.)  Herndon reported stopping several of her medications because she felt they were not helpful.  (*Id.* at 274.)

During a mental status examination that day, treatment providers determined Herndon was disheveled, cooperative, oriented times four, and demonstrated appropriate tone, prosody, cadence, phonetics, and syntax in her language and speech.  (*Id.* at 275.)  Herndon exhibited a depressed mood and reactive affect, fair judgment, intact memory and cognition, and normal psychomotor activity.  (*Id.* at 275-76.)  Treatment providers found Herndon a low-moderate suicide risk and started her on several medications.  (*Id.* at 277-78.)  Treatment notes reflect Herndon slept well that night.  (*Id.* at 279.)

On March 31, 2017, treatment providers found Herndon well-groomed, with an average demeanor and a depressed and pleasant mood.  (*Id.*)  Herndon stated she had slept badly the night before.  (*Id.*)  During a behavioral assessment later that morning, Karen Nahra, LISW-S, found Herndon "guarded and agitated on approach."  (*Id.* at 281.)  Herndon complained of feeling like a prisoner.  (*Id.*)  Although Herndon stated she had come in for increased auditory and visual hallucinations, she denied any hallucinations since being admitted.  (*Id.*)  Herndon provided "vague responses" to Nahra's questions, and when Nahra prompted her to provide more information, Herndon responded, "'What more do you need?'"  (*Id.*)  Herndon continued to provide vague responses.  (*Id.*)

4

During an occupational therapy evaluation later that afternoon, Andrea Brooks, MOT, OTR/L, found Herndon's hygiene fair, her grooming unkempt, her medication usage inconsistent with poor compliance, and non-compliant with treatment and medications. (*Id.* at 282.) Herndon demonstrated a coherent and concrete thought process, avoidant, dismissive behavior, limited future-oriented thinking, irritable mood, and limited frustration tolerance. (*Id.* at 283.) Herndon was also uncooperative, vague, and "[m]inimally engaged." (*Id.*)

Treatment notes reflect Herndon slept throughout the night. (*Id.* at 284.)

On April 1, 2017, Andrew Hospodor, RN, met with Herndon in her room. (*Id.*) He found her pleasant and cooperative, and Herndon denied all psychiatric symptoms, as well as anxiety and depression. (*Id.*) Herndon told Hospodor she had not slept well and wanted to nap all day. (*Id.*) Hospodor encouraged Herndon to get up and move around the unit; Herndon responded "ok" and rolled over. (*Id.*) Hospodor noted Herndon was medication compliant. (*Id.*) That night, Herndon slept for seven hours. (*Id.* at 285.)

On April 2, 2017, Hospodor noted Herndon was napping and in her room most of the day. (*Id.*) Herndon denied being anxious but endorsed depression that she rated an 8/10 and reported visual hallucinations of seeing the devil. (*Id.*) Hospodor encouraged Herndon to leave her room and interact with her peers, and Herndon told him she would try. (*Id.*) Later that day, Manika Davis, RN, noted Herndon had a flat affect and did not feel like talking. (*Id.* at 285-86.) When Michelle Zuehlke, RN, took over Herndon's care later that afternoon, she found Herndon socializing with a visitor and noted Herndon had a bright affect, although Herndon told her she was depressed and seeing the devil. (*Id.* at 286.) Zuehlke found Herndon's behavior under control. (*Id.*)

That evening, Mary Harrison, CNS, evaluated Herndon. (*Id.*) Herndon complained of feeling frustrated and aggravated because her symptoms were not improving, and while everyone kept telling her

the medications would work, they did not.  (*Id.*)  Herndon reported sleeping poorly the night before and complained that Doxepin did not work.  (*Id.*)  Harrison deferred changing medications to Herndon's regular treatment provider, although she increased Herndon's Doxepin.  (*Id.*)  On examination, Harrison found Herndon disheveled, cooperative, and oriented times four, with appropriate tone, prosody, cadence, phonetics, and syntax in her speech.  (*Id.*)  Herndon exhibited a depressed and irritable mood with a scowling affect, coherent thought, fair judgment, intact memory/cognition, and normal psychomotor activity.  (*Id.*)

Treatment providers noted that while Herndon continued to be depressed, she was better and trying to improve and think positively.  (*Id.* at 288.)  That night, Herndon slept for seven hours.  (*Id.*)

On April 3, 2017, Nurse Hospodor examined Herndon.  (*Id.*)  He found her disheveled and unkempt.  (*Id.*)  Herndon denied anxiety and auditory hallucinations but endorsed depression and visual hallucinations of the devil.  (*Id.*)  Herndon told Hospodor she did not want to interact with anyone in the unit or get out of bed.  (*Id.*)  Herndon's friend came to visit that day and Herndon requested her friend take her personal items home for her.  (*Id.*)  Later that morning, treatment providers examined Herndon and found her disheveled, dramatic and defensive, fully oriented, angry and anxious, with limited insight and judgment, inappropriately loud and pressured speech, intact memory/cognition, and normal psychomotor activity.  (*Id.* at 289.)  That evening, Herndon was vague and minimizing in responding to assessment questions and she denied depression, anxiety, suicidal and homicidal ideation, and auditory and visual hallucinations.  (*Id.* at 290.)  Herndon was noted to be interacting appropriately with her visitor and told treatment providers she was all right.  (*Id.*)  Herndon slept through the night.  (*Id.*)

On April 4, 2017, Dale Roman, M.D., noted Herndon continued to improve, felt less depressed, was improving overall, and was thinking positively.  (*Id.* at 291.)  Later that morning, Herndon complained that she was frustrated because she felt the same but was doing okay.  (*Id.*)  She reported not

sleeping well at night and sleeping during the day.  (*Id.*)  Herndon told Dr. Roman she wanted to go home and get on with her life.  (*Id.*)  On examination, Dr. Roman found Herndon disheveled, hostile, fully oriented, with inappropriately loud and overly detailed speech, angry mood/affect, coherent and logical thought form, coherent thought content, poor insight, intact cognition, and normal psychomotor activity.  (*Id.* at 291-92.)  Later that afternoon, Nancy Laboy, RN, noted Herndon had been out on the unit and frequently on the telephone.  (*Id.* at 292-93.)  Herndon denied all psychiatric symptoms.  (*Id.* at 293.)  That evening, although Herndon was still disheveled, she denied any hallucinations and stated she was feeling better than when she was first admitted.  (*Id.*)  Herndon rested for approximately seven hours that night. (*Id.*)

On April 5, 2017, treatment providers noted Herndon continued to improve.  (*Id.*)  Dr. Roman noted Herndon denied medication side effects "while reporting improvement in her mood and further symptoms that were present at [the] time of admission."  (*Id.* at 294.)  At discharge, Herndon denied auditory and visual hallucinations, she was motivated for treatment and compliance, and said she understood her post-discharge plan.  (*Id.*)  Dr. Roman concluded, with a reasonable degree of medical certainty, that Herndon was a low risk of acute harm to herself or others, and a mild/moderate risk on a chronic basis given her history.  (*Id.*)  Herndon reported she was feeling better and would be living with her friend after leaving the hospital.  (*Id.* at 294-95.)  On examination, Herndon was casually dressed, hostile, and fully oriented, with inappropriately loud speech, angry mood/affect, coherent thought, limited insight, fair judgment, intact memory/cognition, and normal psychomotor activity.  (*Id.* at 295.)

On April 6, 2017, Herndon saw Petitt for follow up after being discharged from Lutheran Hospital. (*Id.* at 249.)  Herndon reported the voices were gone now.  (*Id.*)  Herndon told Petitt she had been given a prescription and was getting it filled that day.  (*Id.*)  Herndon reported her appetite was okay, her weight was stable, and her sleep had been poor.  (*Id.*)  Herndon told Petitt, "'I just want me some Ambien and I

think you just need to give me some.'" (*Id.*)  Herndon denied any hallucinations but told Petitt she still saw the devil.  (*Id.*)   Herndon further denied any thoughts of self-harm or hurting others, as well as mood swings.  (*Id.*)  Herndon reported her mood and anxiety were not so good because she did not have any Ambien, and the hospital refused to provide it to her either.  (*Id.*)  Petitt noted she attempted to educate and support Herndon.  (*Id.*)   Herndon stated she was taking Latuda, Melatonin, Zoloft, and "something else." (*Id.* at 250.)  Petitt described Herndon as having made "some progress." (*Id.*)  Petitt noted Herndon had yelled at her and Herndon stated she needed to think over whether she was going to return.  (*Id.*)

On April 25, 2017, Herndon saw Petitt for follow up.  (*Id.* at 251.)  Herndon reported taking her medication as prescribed.  (*Id.*)  Her appetite was normal, and sometimes her sleep was okay while sometimes it was not.  (*Id.*)  While Herndon denied any auditory hallucinations, she reported still seeing the devil, although she ignored him.  (*Id.*)  Herndon denied having mood swings and told Petitt, "'I am doing better and followed all the directions with food and pills and keeping my apts.'" (*Id.*)

On May 16, 2017, Herndon saw Petitt for follow up.  (*Id.* at 253.)  Herndon reported she had been compliant with her medications until she ran out of her Latuda, but she told Petitt it did not matter since the medication did not work.  (*Id.*)  Herndon stated she needed something to get rid of the noise in her head, improve her mood, and help her sleep.  (*Id.*)  Herndon told Petitt she wanted to get back on the Abilify shot, but it needed to be stronger than before.  (*Id.*)  Herndon complained she could still see and hear things, and she wanted and needed it to stop.  (*Id.*)  Herndon denied mood swings, and reported she was trying really hard to make this work.  (*Id.*)  Petitt noted Herndon "[d]escribes significant stressors due to mood and anxiety Sleep . . . ." (*Id.*)  Petitt determined there had been no change in Herndon's progress. (*Id.* at 254.)

On June 14, 2017, Herndon missed her follow up appointment with Petitt.  (*Id.* at 255.)

On June 21, 2017, Herndon saw Petitt for follow up and for completion of her disability

paperwork.  (*Id.* at 256.)  Herndon reported she had run out of her Abilify and had forgotten to come in for the shot.  (*Id.*)  Herndon requested a new doctor because Petitt would not prescribe Ambien.  (*Id.*) Herndon reported her sleep was "horrible" and she was taking 20 to 40-minute naps during the day.  (*Id.*) Herndon told Petitt she could still see and hear things and was still seeing the devil but denied mood swings.  (*Id.*)  Herndon stated, "'I am tired of all the questions and just need the Ambien back or I will [sic] some body [sic] else for it.'"  (*Id.*)  Herndon complained of still getting sad and upset, and blamed Petitt for not prescribing Ambien and Valium.  (*Id.*)  Petitt noted:

> Educated re importance of self care and limit setting[.] Attempted to educate as to why not writing for Ambien and or Xanax – not interested . . .  Client is agitated but we[sic] is controlled – educated will not prescribe Ambien and or Xanax[.] Declines follow up with RN – agree to return if she can see a new provider – educated can not state she will get RX she is requesting[.] Client offered apt with new provider next week: "No not coming back that soon let me think on it and will come back in 2 weeks for the pills but not to talk to new person I will talk to them at the desk."

(*Id.* at 257.)

On June 21, 2017, Herndon's mother, Charmaine Kelly, completed a Function Report.  (*Id.* at 192-99.)  Kelly described Herndon as depressed, "annoying," she talked to herself, she cried and paced a lot, and she did not sleep much.  (*Id.* at 192.)  Herndon also stared, suffered from daytime nightmares, heard voices, and saw the devil and dead people.  (*Id.*)  Kelly reminded her daughter to use the bathroom, comb her hair, and be still and go to sleep.  (*Id.* at 193-94.)  Kelly did not allow Herndon to shave because she was afraid Herndon might cut herself or Kelly.  (*Id.* at 193.)  Kelly also prepared all meals because she did not "want anything to catch a fire," and stated Herndon was not going to cook in her house because Herndon could not be still, paced back and forth, and walked off a lot.  (*Id.* at 194.)  Kelly reported Herndon did not do house or yard work because she was very fidgety, would not be still, was "zoned out," and saw and heard things that were not there.  (*Id.* at 194-95.)  Herndon did not go out alone because she might hurt herself or someone else or get lost.  (*Id.* at 195.)  Kelly reported Herndon did not drive because

she was hyper at times, delusional, and saw things and heard voices. (*Id.*) Kelly shopped for Herndon. (*Id.*) Kelly stated Herndon had no hobbies, she was depressed and cried every day, and had no friends because of her behavior. (*Id.* at 196.) Kelly made sure Herndon went to her appointments. (*Id.*) Kelly reported Herndon could not pay attention for long, could not finish what she started, could not follow written instructions at all, could not follow spoken instructions very well, and stayed to herself because she did not get along with authority figures well for too long. (*Id.* at 197-98.) Herndon could not handle stress at all and was not good with changes in her routine. (*Id.* at 198.) Kelly also reported the medications Herndon was on did not help at all with Herndon's symptoms. (*Id.* at 199.)

On July 27, 2017, Herndon saw Emily Grimm, NP. (*Id.* at 258-59.) Herndon reported she was having auditory and visual hallucinations and could not sleep, and she had decided she needed a new doctor. (*Id.* at 258.) Herndon said she had never received a prescription for Latuda and had never been on it. (*Id.*) Herndon told Grimm she had been on Aristada, and Grimm noted it was unclear why Herndon stopped taking it. (*Id.*) Herndon reported she could not sleep at night and "'walk[ed] for distances'" at night. (*Id.*) Herndon told Grimm Ambien was the only thing that helped her sleep, and it also helped the voices. (*Id.*) Herndon reported she was homeless and living with her mother, where she had her own room. (*Id.*) Grimm assessed Herndon as follows:

> Dx: Unspecified Bipolar Disorder (working); Unspecified Anxiety Disorder; R/O Unspecified Depressive disorder; cluster B traits; R/O Schizoaffective Disorder; suspect ID[.] Assuming care of client as she refused to see previous provider after being denied Ambien and benzos. Irritable and anxious. [R]uminating about sleep aid that is a controlled substance. Was understanding with education and redirection about this provider not feeling controlled substances were clinically appropriate at this time. Unclear if zoloft was activating. Client is a poor historian with poor fund of knowledge. Suspect intellectual delay due to very concrete thinking. Struggles to understand rationale for medications. Gives reports of past med adherence that conflict with previous notes. Difficult to refine diagnosis. Does have some loud pressured speech. Significant mood dysregulation. [S]uspect some symptom exaggeration. AH/VH likely related to trauma history, cluster b traits, poor coping and possible ID. No acute safety concerns. Unclear if related to underlying hypomania. [U]nclear if insomnia is

10

related to untreated mood disorder. Will continue to clarify diagnosis and build rapport.

(*Id.* at 259.) Grimm restarted Herndon on Latuda, held Zoloft, and discontinued Melatonin.  (*Id.*)

On August 31, 2017, Herndon saw Grimm for follow up.  (*Id.* at 455.)  Herndon reported feeling the same.  (*Id.*)  While her sleep was better, she was having nightmares every time she slept.  (*Id.*)  Herndon complained of getting four to five hours of sleep a night and having daytime fatigue.  (*Id.*)  Herndon also reported feeling more paranoid, and still seeing the devil.  (*Id.*)  Herndon described being "hypervigilant" when she was not at home, but she felt very safe and secure when she had other people around her that she knew.  (*Id.*)  Herndon also reported "chronic intermittent SI when under stress, though none currently."  (*Id.* at 456.)  Herndon told Grimm knowing her family would miss her and that her mother could not afford to pay for her funeral kept her from developing a suicidal plan or intent.  (*Id.*)  Herndon denied medication side effects.  (*Id.*)  Grimm determined Herndon had made minimal progress.  (*Id.*)  Grimm noted Herndon was less angry and irritable, and much more engaged with her, than past visits.  (*Id.* at 457.)  Grimm suspected "past reports of mania are related to poor coping, minimal fund of knowledge, cluster b traits and poor coping."  (*Id.*)  Grimm noted Herndon's "[p]sychotic symptoms are vague but remain bothersome."  (*Id.*)  Grimm increased Latuda, continued Remeron, and started Prazosin for Herndon's violent frequent nightmares and traumatic history.  (*Id.*)

On September 28, 2017, Herndon saw Grimm for follow up.  (*Id.* at 451.)  Herndon complained of not sleeping again, racing thoughts, inability to concentrate or focus, feeling more worried, paranoid, and exhausted, passing suicidal ideation with no plan, and continued auditory and visual hallucinations that were not helped by Latuda.  (*Id.*)  Herndon told Grimm she was not feeling suicidal that day.  (*Id.* at 452.)  Herndon reported dizziness she thought may have been caused by the Prazosin, but it had resolved.  (*Id.*)  Grimm noted Herndon had made minimal progress.  (*Id.* at 452-53.)  Grimm found Herndon calm, pleasant, and cooperative, although Herndon reported minimal improvement in her mood and anxiety after

11

the last adjustment to her medication. (*Id.* at 453.) Grimm suspected the auditory hallucinations were related to internal dialogue and not actual hallucinations. (*Id.*) Grimm still suspected Herndon's visual hallucinations were "at least partly related to trauma hx, cluster b traits and poor coping," but noted it was something Herndon found "intrusive and distressing." (*Id.*) Grimm found Herndon's "engagement and motivation for treatment" continued to increase. (*Id.*) Grimm noted protective factors included "very supportive family and friends," Herndon was future-oriented, and she had housing. (*Id.*) Grimm determined Herndon was a "chronic moderate risk for self-harm/suicide but an acute low risk." (*Id.*) Grimm again increased Latuda and continued Remeron and Prazosin. (*Id.*)

On October 26, 2017, Herndon saw Grimm for follow up. (*Id.* at 447.) Herndon reported she was doing the same; she was still tired and depressed and still seeing and hearing things. (*Id.*) Herndon told Grimm she did not want to be around people and was thinking of her hurting herself. (*Id.*) Herndon reported she was sleeping for a couple of hours before she was up again but told Grimm she was a lot better than she was before. (*Id.*) However, Herndon then said she did not sleep enough to have nightmares. (*Id.*) Grimm found Herndon irritable and isolative. (*Id.*) Herndon denied any medication side effects. (*Id.* at 448.) Grimm found Herndon had no change in progress. (*Id.*) Grimm noted that while Herndon reported minimal change in her symptoms, her "affect is much more full and bright in comparison to past visits." (*Id.* at 448-49.) Grimm further noted it was hard to get a clear picture of Herndon's symptoms "as she makes conflicting statements (i.e. sleep issues) related to ID and concrete thought process." (*Id.* at 449.) Grimm determined Herndon did not appear to be internally stimulated and noted Herndon continued to open up more with each visit and was trying to verbalize her feelings to the best of her ability. (*Id.*) Grimm noted Herndon was still resistant to considering an underlying medical cause for her sleep issues. (*Id.*) Grimm continued Latuda and Remeron, started Lamictal, and discontinued Prazosin as it was unhelpful. (*Id.*) Grimm noted Herndon's reports of nightmares that day

were "vague."  (*Id.*)

On December 19, 2017, Herndon saw Grimm for follow up.  (*Id.* at 439.)  Herndon reported she was not doing well; she had taken Saphris and fell asleep in her food at dinner.  (*Id.*)  Herndon told Grimm she had suicidal thoughts daily, but her family was a protective factor.  (*Id.*)  Herndon reported she did not feel her symptoms were severe enough to warrant hospitalization.  (*Id.*)  Herndon stated she was not getting more than three hours of sleep a night.  (*Id.*)  Grimm found Herndon's situation was worse.  (*Id.* at 440.)  Grimm noted Herndon experienced an increase in symptoms after discontinuing medication because of sleepiness, and that Herndon appeared more depressed and more agitated.  (*Id.*)  Grimm found no change in Herndon's chronic suicidal ideation.  (*Id.*)  Herndon asked to try a different medication regimen, and Grimm noted she would titrate the medication more slowly to avoid side effects.  (*Id.*)  Grimm discontinued Saphris, started Zyprexa, continued Remeron, and increased Lamictal.  (*Id.* at 441.)  Grimm noted Herndon had "failed multiple trials on various meds including atypical antipsychotics due to confirmed and perceived side effects."  (*Id.*)

On January 2, 2018, Herndon saw Grimm for follow up.  (*Id.* at 435.)  Herndon reported an improvement in her auditory hallucinations, but still complained of seeing things and of having nightmares of her dead grandmother.  (*Id.*)  Herndon told Grimm she had tried to be in good spirits for the new year and not be so depressed.  (*Id.*)  Herndon denied suicidal ideation and rated her depression at a 0/10.  (*Id.*)  Herndon described her sleep as about the same, but she stated she was not unhappy with it.  (*Id.*)  Herndon endorsed anxiety, which she rated as a 5/10.  (*Id.*)  Herndon denied any medication side effects.  (*Id.* at 436.)  Grimm noted Herndon had made some progress.  (*Id.*)  Grimm determined Herndon's mood had improved with more stability since the last medication change, she had decreased depression as a result of the medication change and motivation by the New Year, her auditory hallucinations had "decreased significantly," and her visual hallucinations remained, with her anxiety

13

moderate as a result.  (*Id.* at 437.)  Grimm continued Herndon's medications, as Herndon requested to remain at her current doses for a little longer before making any necessary adjustments.  (*Id.*)

The record does not contain any additional mental health treatment notes.

## C.    State Agency Reports

On July 3, 2017, state agency psychologist Karla Delcour, Ph.D., found Herndon had severe impairments of depressive, bipolar, and related disorders and schizophrenia spectrum and other psychotic disorders.  (*Id.* at 80.)  Dr. Delcour opined Herndon did not meet the "A" criteria of Listings 12.03 and 12.04 and went on to consider the "B" criteria.  (*Id.*)  She found Herndon had moderate limitations in all four areas.  (*Id.*)  Dr. Delcour opined the evidence did not establish the presence of "C" criteria.  (*Id.*)  Dr. Delcour found Herndon was moderately limited in her abilities to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted by them, and complete a normal a workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  (*Id.* at 82-83.)  She found Herndon markedly limited in her ability to interact with the general public.  (*Id.* at 83.)  Dr. Delcour opined Herndon could understand and remember simple repetitive instructions and "would likely perform optimally in a setting that entails minimal interaction." (*Id.*)  Dr. Delcour further opined Herndon could "relate adequately on a superficial basis" and could "adapt to a setting in which duties are routine and predictable."  (*Id.* at 83-84.)

On September 6, 2017, on reconsideration, state agency reviewing psychiatrist Robert Baker, Ph.D., affirmed Dr. Delcour's findings regarding the "A", "B," and "C" criteria.  (*Id.* at 94.)  Dr. Baker also affirmed Dr. Delcour's findings regarding Herndon's abilities.  (*Id.* at 96-98.)  Dr. Baker found Herndon was able to understand and remember one to three step instructions, concentrate sufficiently to complete one to three step tasks, work in a separate workspace with occasional superficial interactions

with others, and adapt to a setting where duties are routine and predictable.  (*Id.* at 96-98.)   Dr. Baker opined Herndon "may need occasional flexibility with breaks when experiencing increased symptoms" and "may need advance notice of major changes, which should be gradually implemented allowing her time to adjust to them."  (*Id.* at 97-98.)  Dr. Baker provided the following additional explanation:

> Clt has a history of substance abuse and chronic depression that may involve some psychotic symptoms. MER indicates that clmt changed providers in order to obtain medications (Ambien and "benzos"). Provider also suspected symptom exaggeration. Inconsistencies in her presentation in different settings casts some doubt on the severity of her symptoms and alleged limitations.

(*Id.* at 98.)

## D.  **Hearing Testimony**

During the October 31, 2018 hearing, Herndon testified to the following:

- She tried working in 2018.  (*Id.* at 43.)  She walked off a factory job because she could not keep up and she would tell staff that she could not keep up, but they would still put her on the line.  (*Id.* at 45-46.)  She then tried working at the deli at Giant Eagle for a week.  (*Id.* at 46.)  On her third day of work, she almost cut her thumb off on the meat slicer.  (*Id.* at 46-47.)

- She has not been taking medication since she lost her insurance a month ago.  (*Id.* at 47.)  She did not know if her medication improved her condition.  (*Id.* at 48.)  Even on it she still felt the same and was not sleeping.  (*Id.*)  She did not ever see a change. (*Id.*)

- She is depressed a lot but could not describe how she feels.  (*Id.*)  She only periodically sleeps; she sleeps for an hour or two and then is up for three hours.  (*Id.* at 49.)  When she wakes up, she feels bothered and worried, and she hallucinates and sees things.  (*Id.*)  She never feels rested.  (*Id.*)  She sees the devil all the time.  (*Id.*) She sometimes hears things, and described it as hearing her conscience telling her to hurt herself or be mean and vicious.  (*Id.* at 50.)  She has a lot of trouble concentrating and cannot stay focused.  (*Id.*)  She is not around people a lot.  (*Id.* at 51.)  She sees her mother, whom she does not think can tolerate her, and she does not go out.  (*Id.*)  She does not eat or communicate when she goes out, so it is sad for her and she does not do a lot and is not around a lot of people.  (*Id.*)  She feels paranoid all the time.  (*Id.*)  She has passive thoughts of ways to kill herself.  (*Id.* at 52.)  She cannot be still and needs to be doing something all the time.  (*Id.* at 53.)  She sometimes sees dead people.  (*Id.* at 59.)

- She spends a typical day waiting for her mother to get home from work.  (*Id.* at 53.) If her mother is not home, it is hard for her to go out or go to the library, and so she is

in the house most of the time.  (*Id.*)  She watches TV.  (*Id.* at 54.)  She tries to do puzzles but cannot do them for more than three to five minutes because she gets frustrated easily.  (*Id.*)  Her mother cooks and cleans.  (*Id.*)  She does clean her room.  (*Id.*)  Her mother does the grocery shopping.  (*Id.* at 57.)  Herndon can use the microwave and make sandwiches and salads.  (*Id.*)

- She showers every other day.  (*Id.* at 55.)  She does not want to shower every day.  (*Id.*)  Some days she is not in the mood to shower.  (*Id.*)  She does not change her clothes every day.  (*Id.* at 56.)  There are a lot of times when she does not leave her bed.  (*Id.*)  She does not shave.  (*Id.* at 59.)  There is no particular reason for why she does not do so.  (*Id.* at 60.)  Her mother has to remind her to comb her hair or wash her face daily.  (*Id.*)

- She has a driver's license and she drives occasionally.  (*Id.* at 62.)  If one of her friends came to get her, she would ask to drive their car.  (*Id.* at 63.)  She goes to her friends' house when she drives their cars.  (*Id.*)  She does not have custody of her two children because Children's Services found she was not a stable parent after she left her children somewhere.  (*Id.* at 65.)  She was on the streets at the time.  (*Id.* at 66.)

The ALJ posed the following hypothetical question to the VE:

> Mr. Salkin, at this time I'd ask you to assume a hypothetical individual with no past work. I'd further ask you to assume the hypothetical individual is limited to the following. The hypothetical individual would be able to work at all exertional levels, but would have the following further restrictions. The hypothetical individual would be limited to simple tasks, limited to routine and repetitive tasks. The hypothetical individual would be limited to hearing and understanding simple oral instructions and limited to communicating simple information. The hypothetical individual would be limited insofar as they would be where they would require a static work environment. They would be able to tolerate few changes in a routine work setting; however, when said changes did take place they would need to take place gradually and would occur infrequently. The hypothetical individual would be limited to occasional interaction with a small group of coworkers, but that contact would be casual in nature. The hypothetical individual would be limited to occasional superficial interaction with the public. And by superficial I mean if a member of the public were to approach and inquire as to the location of the nearest restroom, they'd be able to provide that information, but that would be the extent of the interaction. The hypothetical individual would not be able to perform at a production rate pace such as an assembly line worker, but could perform goal oriented work such as an office cleaner.   Mr. Salkin, with those restrictions would there be any work in the national economy for such an individual? And if so, can you give me a few examples and numbers of jobs for each occupation?

(*Id.* at 68-69.)

The VE testified the hypothetical individual would also be able to perform representative jobs in the economy, such as dishwasher, janitor, and landscape laborer.  (*Id.* at 69.)

The ALJ then asked the VE whether a hypothetical individual who was unable to stay on task without being distracted and would find themselves off-task 20% or more most days would be able to perform the sample jobs the VE identified.  (*Id.* at 69-70.)  The VE testified such an individual could not perform the sample jobs previously identified, and that such a restriction would be work preclusive.  (*Id.* at 70.)

### III.     STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. § 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her

17

past relevant work, the claimant is not disabled. 20 C.F.R. § 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. § 416.920(g).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since May 16, 2017, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: schizoaffective disorder, bipolar disorder or depressive type mood disorder, and anxiety disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to simple tasks; limited to routine and repetitive tasks; limited to hearing and understanding simple oral instructions; limited to communicating simple information; limited to a static work environment – tolerate few changes in a routine work setting and when said changes do occur, they need to take place gradually and would occur infrequently; limited to occasional interaction with a small group of co-workers, where the contact is casual in nature; limited to occasional, superficial interaction with the public; she is not able to perform at a production rate pace (for example assembly line work), but she can perform goal-oriented work (for example, office cleaner)[.]

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on March **, 1983 and was 34 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.  The claimant has not been under a disability, as defined in the Social Security Act, since May 16, 2017, the date the application was filed (20 CFR 416.920(g)).

(Tr. 18-32.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec*., 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must

stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.    First Assignment of Error

#### 1.    Step Three

Herndon argues the ALJ's determination that Herndon did not meet or equal a Listing was not supported by substantial evidence.  (Doc. No. 15 at 11-12.)  Herndon accuses the ALJ of cherry-picking

the evidence to find she did not have marked limitations in at least two domains of the Paragraph "B" criteria.  (*Id.* at 9-12.)

The Commissioner responds that the ALJ properly determined that Herndon did not meet or equal a Listing at Step Three.  (Doc. No. 16 at 5-11.)

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments.  *See* 20 C.F.R. § 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. § 416.925(a).  Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. § 416.925(c)(3).  It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment.  *See e.g. Lett v. Colvin*, No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015).  A claimant must satisfy all of the criteria to "meet" the listing.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).  A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. § 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. § 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments

in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment.  *See Reynolds v. Comm'r of Soc. Sec*., 424 Fed. Appx. 411, 414-15 (6th Cir. 2011).  In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision.  *Id.* at 416-17.  *See also Harvey v. Comm'r of Soc. Sec*., No. 16-3266, 2017 WL 4216585, at *5 (6th Cir. March 6, 2017) ("In assessing whether a claimant meets a Listing, the ALJ must 'actually evaluate the evidence,' compare it to the requirements of the relevant Listing, and provide an 'explained conclusion, in order to facilitate meaningful judicial review.'") (quoting *Reynolds*, 424 F. App'x at 416); *Joseph v. Comm'r of Soc. Sec*., 741 F. App'x 306, 311 (6th Cir. July 13, 2018) (same)).  *See also Snyder v. Comm'r of Soc. Sec*., No. 5:13cv2360, 2014 WL 6687227, at *10 (N.D. Ohio Nov. 26, 2014) ("Although it is the claimant's burden of proof at Step 3, the ALJ must provide articulation of his Step 3 findings that will permit meaningful review. . . This court has stated that 'the ALJ must build an accurate and logical bridge between the evidence and his conclusion.'") (quoting *Woodall v. Colvin*, 5:12CV1818, 2013 WL 4710516, at *10 (N.D. Ohio Aug.29, 2013)).

The record reflects Herndon argued that she met the requirements of Listing 12.03 at the October 31, 2018 hearing before the ALJ.  (Tr. 43.)  At Step Two, the ALJ found that Herndon's schizoaffective disorder, bipolar disorder or depressive type mood disorder, and anxiety disorder constituted severe impairments.  (*Id.* at 18.)  At Step Three, the ALJ expressly stated that he considered Listings 12.03, 12.04, and 12.06 and addressed the paragraph B and C criteria for those listings as follows:

> In understanding, remembering, or applying information, the claimant has a moderate limitation.
>
> The claimant's functioning in this area independently, appropriately, effectively, and on a sustained basis fair. The claimant testified that she has hallucinations; she has trouble focusing; she has difficulty being around others and communicating; she feels paranoid all the time; she has a driver's license; she is able to go to the library; she watches television during the day; her mother brings over puzzles and she works on them for a few minutes; and she drives her friend's car. (Testimony).

22

On April 6, 2017, the claimant reported that her medication had gotten rid of the auditory hallucinations. (4F/16). On August 31, 2017, the claimant noted she continued to have visual hallucinations. (5F/25). On January 2, 2018, the claimant reported that she still was seeing things, but she was not having auditory hallucinations much anymore; and she denied any medication side effects. (5F/3-4).

The record supports that the claimant received psychiatric medication management and counseling at the time of her application for benefits until January of 2018. On March 24, 2017, while at the emergency department, the treating medical providers noted that she was alert, fully oriented, her mood and affect were normal, and she was no apparent risk to herself or others. (2F/5). On August 31, 2017, the nurse noted that the claimant's insomnia had improved; she was less angry and irritable than in past visits; her thought process was concrete; and her fund of knowledge was minimal. (5F/25). At exam on September 28, 2017, she was calm, pleasant, and cooperative; she was a limited historian; and she was not acute safety issue. (5F/21).

On October 26, 2017, the claimant's affect was more full and bright; she was a very limited historian; and she was more open with the provider. (5F/l 7). At exam on November 29, 2017, the claimant was calm, pleasant, and cooperative; and there were no acute safety concerns. (5F/13). On January 2, 2018, the nurse noted that the claimant's mood had improved with more stability since last medication change, and she continued to have visual hallucinations and anxiety. (5F/5). The record does not support that the claimant returned for any additional treatment or that she had any additional hospitalizations thereafter.

While these examinations show some degree of impairment, they do not show that the claimant has experienced significant difficulty in these areas of functioning as a result. The undersigned reached this conclusion after noting the inconsistent presentation the claimant has made to medical providers, and in considering her presentation at the hearing. Despite the relatively stressful nature of the hearing, the claimant did not appear to have any difficulty understanding, remembering, or responding to questions asked by counsel or the undersigned. (Hearing Observation). The claimant's responses were quick, on topic, and she answered fully the questions asked. (Hearing Observation). She presented as a good history regarding her mental health treatment history. (Hearing Observation).

After reviewing the medical evidence of record available to them, including some of the aforementioned mental status examination findings, the state agency psychological consultant, Dr. Delcour, opined that the claimant is able to understand and remember simple repetitive instructions; she is able to carry out simple repetitive instructions. (1A/8-10). Dr. Baker opined that the claimant is able to understand and remember 1-3 step instructions. (3A/9-l l). They opined further that the claimant has "moderate" limitation in understanding, remembering, or applying information. (lA/6 and 3A/7). After considering all of

23

the evidence of record, the undersigned acknowledges that the claimant's impairments have affected her functioning in these areas to some degree; however, the evidence of record establishes that her residual functional limitations are no worse than fair. Accordingly, the undersigned finds that the claimant has moderate limitation in these areas of functioning.

In interacting with others, the claimant has a moderate limitation.

The claimant's functioning in this area independently, appropriately, effectively, and on a sustained basis is fair. The claimant testified that she has difficulty being around others and communicating; she feels paranoid all the time; she does not like being around people; when she goes out to dinner, she does not like to laugh or communicate; she will go out of the house with her mom to places; she is able to go to the library; she showers every other day because she has nowhere to go; she drives her friend's car; and her friend told her about a potential job. (Testimony). On April 6, 2017, the claimant reported that her medication had gotten rid of the auditory hallucinations; her appetite was good; and her sleep was not good since stopping Ambien. (4F/16). On January 2, 2018, the claimant reported that she was still seeing things, but she was not having auditory hallucinations much anymore; and she denied any medication side effects. (5F/3-4).

The record supports that the claimant received psychiatric medication management and counseling at the time of her application for benefits until January of 2018. On March 24, 2017, while at the emergency department, the treating medical providers noted that she was alert, fully oriented, her mood and affect were normal, and she was no apparent risk to herself or others. (2F/5). On August 31, 2017, the nurse noted that the claimant was less angry and irritable than in past visits. (5F/25).  At exam on September 28, 2017, she was calm, pleasant, and cooperative. (5F/21). On October 26, 2017, the claimant's affect was more full and bright, and she was more open with the provider. (5F/l7). At exam on November 29, 2017, the claimant was calm, pleasant, and cooperative. (5F/13). On January 2, 2018, the nurse noted that the claimant's mood had improved with more stability since last medication change, and she continued to have visual hallucinations and anxiety. (5F/5). The record does not support that the claimant returned for any additional treatment or that she had any additional hospitalizations thereafter. While these examinations show that the claimant's mental impairments impact her ability to interact with others to some degree, they do not show a significant or serious degree of impairment. Despite the relatively stressful nature of the hearing, the claimant did not appear to have any difficulty interacting with counsel or the undersigned. (Hearing Observation).

After reviewing the medical evidence of record available to them, including some of the aforementioned mental status examination findings, the state agency psychological consultant, Dr. Delcour, opined that the claimant has "moderate" limitation in interacting with others. (1A/6 and 3A/7). The undersigned acknowledges that the claimant's mental impairments have impacted her ability

to interact with others to some degree; however, the mental status examinations and persuasive medical opinions do not support that she experiences a significant or marked degree of limitation in interacting with others. The evidence of record establishes that her residual functional limitations are no worse than fair. Accordingly, the undersigned finds that the claimant has moderate limitation in this area of functioning.

With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation.

The claimant's functioning in this area independently, appropriately, effectively, and on a sustained basis is fair. The claimant testified that she has hallucinations; she has trouble focusing; she has difficulty being around others and communicating; she feels paranoid all the time; she has a driver's license; she is able to go to the library; she watches television during the day; her mother brings over puzzles and she works on them for a few minutes; and she drives her friend's car. (Testimony). On April 6, 2017, the claimant reported that her medication had gotten rid of the auditory hallucinations. (4F/16). On August 31, 2017, the claimant noted she continued to have visual hallucinations. (5F/25). On January 2, 2018, the claimant reported that she still was seeing things, but she was not having auditory hallucinations much anymore; and she denied any medication side effects. (5F/3-4).

The record supports that the claimant received psychiatric medication management and counseling at the time of her application for benefits until January of 2018. On March 24, 2017, while at the emergency department, the treating medical providers noted that she was alert, fully oriented, her mood and affect were normal, and she was no apparent risk to herself or others. (2F/5). On August 31, 2017, the nurse noted that the claimant's insomnia had improved; she was less angry and irritable than in past visits; and her thought process was concrete. (5F/25). At exam on September 28, 2017, she was calm, pleasant, and cooperative; she was a limited historian; and she was not acute safety issue. (5F/21).

On October 26, 2017, the claimant's affect was more full and bright; she was a very limited historian; and she was more open with the provider. (5F/l7). At exam on November 29, 2017, the claimant was calm, pleasant, and cooperative; and there were no acute safety concerns. (5F/13). On January 2, 2018, the nurse noted that the claimant's mood had improved with more stability since last medication change, and she continued to have visual hallucinations and anxiety. (5F/5). The record does not support that the claimant returned for any additional treatment or that she had any additional hospitalizations thereafter.

While these examinations show some degree of impairment, they do not show that the claimant has experienced significant difficulty in these areas of functioning as a result. The undersigned reached this conclusion after noting the inconsistent presentation the claimant has made to medical providers, and in

considering her presentation at the hearing. Despite the relatively stressful nature of the hearing, the claimant did not appear to have any difficulty concentrating on, or persisting through the hearing with questions asked by counsel or the undersigned. (Hearing Observation). The claimant's responses were quick, on topic, and she answered fully the questions asked. (Hearing Observation).

After reviewing the medical evidence of record available to them, including some of the aforementioned mental status examination findings, the state agency psychological consultant, Dr. Delcour, opined that the claimant is able to carry out simple repetitive instructions. (lA/8- 10). Dr. Baker opined that the claimant is able to concentrate sufficiently for the complete of 1-3 step tasks. (3A/9-11). They opined further that the claimant has "moderate" limitation in concentrating, persisting, or maintaining pace. (lA/6 and 3A/7). In sum, the record supports that the claimant has encountered some degree of loss in her ability to concentrate, persist, and maintain pace; however, the examination results and the persuasive medical opinions support that the claimant's residual abilities to concentrate, persist, or maintain pace, are no worse than fair. Accordingly, the undersigned finds that the claimant has moderate limitation in these areas of functioning.

As for adapting or managing oneself, the claimant has experienced a moderate limitation.

The claimant's functioning in this area independently, appropriately, effectively, and on a sustained basis is fair. The claimant's reported daily functioning does not support that she has experienced a serious or marked degree of limitation in adapting or managing herself The claimant testified that she has a driver's license; she will go out of the house with her mom to places; she is able to go to the library; she watches television during the day; her mother brings over puzzles and she works on them for a few minutes; she showers every other day because she has nowhere to go; and she drives her friend's car. (Testimony). On April 6, 2017, the claimant reported that her medication had gotten rid of the auditory hallucinations; her appetite was good; and her sleep was not good since stopping Ambien. (4F/16). On August 31, 2017, the claimant noted she was sleeping a little longer; she still had nightmares; she was sleeping about 4-5 hours per night; and she continued to have visual hallucinations. (5F/25). On January 2, 2018, the claimant reported that she still was seeing things, but she was not having auditory hallucinations much anymore; and she denied any medication side effects. (5F/3-4).

The claimant's examination findings, while inconsistent throughout the record, do not support more than a fair or moderate degree of limitation in adapting or managing herself The record supports that the claimant received psychiatric medication management and counseling at the time of her application for benefits until January of 2018. On March 24, 2017, while at the emergency department, the treating medical providers noted that she was alert, fully oriented, her mood and affect were normal, and she was no apparent risk to herself or others. (2F/5).

26

On August 31, 2017, the nurse noted that the claimant's insomnia had improved; she was less angry and irritable than in past visits; her thought process was concrete; and her fund of knowledge was minimal. (5F/25).  At exam on September 28, 2017, she was calm, pleasant, and cooperative; and she was not acute safety issue. (5F/21).

On October 26, 2017, the claimant's affect was more full and bright; she was a very limited historian; and she was more open with the provider. (5F/l7). At exam on November 29, 2017, the claimant was calm, pleasant, and cooperative; and there were no acute safety concerns. (5F/13). On January 2, 2018, the nurse noted that the claimant's mood had improved with more stability since last medication change, and she continued to have visual hallucinations and anxiety. (5F/5). The record does not support that the claimant returned for any additional treatment or that she had any additional hospitalizations thereafter.

After reviewing the medical evidence of record available to them, including some of the aforementioned mental status examination findings, the state agency psychological consultant, Dr. Delcour, opined that the claimant is able to adapt to a setting in which duties are routine and predictable. (lA/8-10). Dr. Baker opined that the claimant is able to adapt to a setting in which duties are routine and predictable. (3A/9-11). They opined further that the claimant has "moderate" limitation in adapting or managing herself (lA/6 and 3A/7). The record supports that the claimant has encountered some degree of loss in her ability adapt or manage herself as before; however, the examination results, the persuasive portions of the medical opinions, and the claimant's reported functioning, show that the claimant's residual abilities to adapt and manage herself, are no worse than fair. Accordingly, the undersigned finds that the claimant has moderate limitation in these areas of functioning.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. These criteria are not met because the "paragraph C" criteria require evidence of a mental disorder that is "serious and persistent", which is established by a medically documented history of the existence of the disorder(s) over a period of at least 2 years, and there is evidence of both: (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and (2) marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c). The claimant's reported daily activities, examination findings, and persuasive portions of the medical opinions discussed above, show a level of functioning inconsistent with a minimal capacity to adapt to changes or to demands that are not already a part

of the claimant's life. Accordingly, the medical evidence of record fails to satisfy the necessary criteria of "paragraph C".

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental functional analysis.

There are no medical opinions of record indicating that any of the claimant's mental or physical impairments meet or equal any of the listed impairments in 20 CPR Part 404, Subpart P, Appendix 1.

(Tr. 19-24.)

Later, in determining Herndon's RFC, the ALJ discussed and analyzed the medical evidence regarding Herndon's mental limitations at great length:

The record supports that the claimant received psychiatric medication management and counseling at the time of her application for benefits until January of 2018. The claimant had a prior psychiatric hospitalization from March 30, 2017 to April 5, 2017. (3F/29). At exam on March 30, 2017, she was disheveled; her behavior was cooperative; she was fully oriented; her speech and language demonstrated appropriate tone, prosody, cadence, phonetics, and syntax; her mood was depressed; her affect was reactive; her thought form was coherent; her judgment was fair; her memory/cognition was intact; and her psychomotor activity was normal. (3F/10-11). At the time of her discharge, she denied suicidal ideation. (3F/29). The claimant's diagnoses included schizoaffective disorder, bipolar type, versus depressive type mood disorder. (1F/24).

On March 24, 2017, while at the emergency department, the treating medical providers noted that she was alert, fully oriented, her mood and affect were normal, and she was no apparent risk to herself or others. (2F/5).

On April 6, 2017, the claimant reported that her medication had gotten rid of the auditory hallucinations; her appetite was good; and her sleep was not good since stopping Ambien. (4F/16). On May 16, 2017, the claimant reported that she ran out of Latuda and had ongoing auditory and visual hallucinations; she had poor sleep; and her appetite was good. (1F/20). She missed psychiatric appointments on June 14, 2017. (1F/22).

28

On June 21, 2017, the claimant reported non-compliance with medication, and she wanted a different prescribing provider because the nurse practitioner would not prescribe Xanax or sleeping pills. (1F/23).

On July 27, 2017, the claimant reported that she had been compliant with medications in the past, but the nurse practitioner's review of her records did not support this assertion. (1F/26). The nurse practitioner noted that she suspected that the claimant was exaggerating her symptoms. (1F/26). The nurse started Latuda and Remeron. (1F/26).

On August 31, 2017, the claimant noted she was sleeping a little longer; she still had nightmares; she was sleeping about 4-5 hours per night; and she continued to have visual hallucinations. (5F/25). The nurse noted that the claimant's insomnia had improved; she was less angry and irritable than in past visits; her thought process was concrete; and her fund of knowledge was minimal. (5F/25).

At exam on September 28, 2017, she was calm, pleasant, and cooperative; she was a limited historian; and she was not acute safety issue. (5F/21). The nurse noted that the claimant was a "chronic moderate risk for self-harm/suicide, but an acute low risk." (5F/21).

On October 26, 2017, the claimant's affect was more full and bright; she was a very limited historian; and she was more open with the provider. (5F/17). The nurse practitioner added Lamictal to the existing prescriptions of Latuda and Remeron. (5F/l 7). On November 29, 2017, the claimant noted similar symptoms. (5F/11). The nurse practitioner considered changing the claimant's medications due to the lack of response alleged by the claimant. (5F/13). On exam that day, the claimant was calm, pleasant, and cooperative; and there were no acute safety concerns. (5F/13). The nurse practitioner started a taper off Latuda and added Saphris. (5F/13).

On December 22, 2017, the claimant reported not doing well, and Saphris was causing severe somnolence. (5F/8).  She was more depressed and agitated, so the nurse adjusted her medication. (5F/8). On January 2, 2018, the claimant reported that she still was seeing things, but she was not having auditory hallucinations much anymore. (5F/3). The claimant denied any medication side effects. (5F/4). The nurse noted that the claimant's mood had improved with more stability since last medication change, and she continued to have visual hallucinations and anxiety. (5F/5). The record does not support that the claimant returned for any additional treatment or that she had any additional hospitalizations thereafter.

*Allegation Analysis*

After careful consideration, the undersigned finds that the claimant's allegations are not entirely consistent with the evidence of record. The claimant's allegations of disabling mental limitations from hallucinations, difficulty concentrating and

focusing, depression, difficulty handling stress, and difficulty interacting with others, are not entirely consistent with the evidence of record.

The medical record supports that the claimant changed providers in order to obtain medications, including requests for Ambien and Xanax (benzodiazepines), and the claimant was upset when her nurse practitioner would not prescribe these medications. (See e.g., 1F/21 and 24; 4F/21; and 5F/34). The claimant's own nurse practitioner suspected symptom exaggeration. (1F/26).

The claimant also testified that her medication did not help (Testimony), which is contrary to the medical evidence of record wherein the claimant reported her medication was helpful. (See e.g., 4F/16 and 5F/25).

There were multiple inconsistencies in her presentation in difference settings, which casts doubt on the severity of her symptoms and alleged limitations. For example, at exam on March 24, 2017, while at the emergency department, the treating medical providers noted that she was alert, fully oriented, her mood and affect were normal, and she was no apparent risk to herself or others. (2F/5). This examination finding in inconsistent with the claimant's allegations of severe mood dysregulation, anxiety, hallucinations, and difficulty interacting with others. The claimant's mental health treatment records reflect a tremendous amount of self-reporting and they reflect very little in the way of objective medical findings. Nonetheless, the objective findings noted in those treatment notes do not reflect a disabling degree of mental functional limitations. For example, on August 31, 2017, the nurse noted that the claimant's insomnia had improved; she was less angry and irritable than in past visits; her thought process was concrete; and her fund of knowledge was minimal. (5F/25). At exam on September 28, 2017, she was calm, pleasant, and cooperative; she was a limited historian; and she was not acute safety issue. (5F/21). On October 26, 2017, the claimant's affect was more full and bright; she was a very limited historian; and she was more open with the provider. (5F/17). At exam on November 29, 2017, the claimant was calm, pleasant, and cooperative; and there were no acute safety concerns. (5F/13). On January 2, 2018, the nurse noted that the claimant's mood had improved with more stability since last medication change, and she continued to have visual hallucinations and anxiety. (5F/5). These examination findings do not support a disabling degree of limitation in any of the areas alleged by the claimant.

The record does not support that the claimant returned for any additional treatment or that she had any additional hospitalizations thereafter, despite reporting improvement in her symptoms to the providers. The fact that the claimant reported improvement in her symptoms from medication and did not continue treatment undermines her allegations. This fact calls into question the claimant's desire to improve her functioning.

Despite the relatively stressful nature of the hearing, the claimant did not appear to have any difficulty understanding, remembering, responding to, concentrating on, persisting through, or adapting to the hearing environment, with questions asked by counsel or the undersigned. (Hearing Observation). The claimant's responses were quick, on topic, and she answered fully the questions asked. (Hearing Observation). She presented as a good history regarding her mental health treatment history. (Hearing Observation). The claimant also did not appear to have any difficulty interacting with her counsel or the undersigned. (Hearing Observation). The claimant did not appear internally stimulated, distracted, or otherwise hindered in her ability to take in information and articulate her responses. (Hearing Observation). These observations tend to support the nurse practitioner's suspicion of symptom exaggeration. In other words, it is difficult to reconcile the claimant's alleged symptoms, with her presentations throughout the record. (See also 1A/7 and 3A/8-9).

After reviewing the medical evidence of record available to them, including some of the aforementioned mental status examination findings, the state agency psychological consultant, Dr. Delcour, opined that the claimant is able to understand and remember simple repetitive instructions; she is able to carry out simple repetitive instructions; and she can adapt to a setting in which duties are routine and predictable. (1A/8-10).  Dr. Baker opined that the claimant is able to understand and remember 1-3 step instructions; she is able to concentrate sufficiently for the complete of 1-3 step tasks; and she is able to adapt to a setting in which duties are routine and predictable. (3A/9-11). They opined further that the claimant has "moderate" limitation in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself (1A/6 and 3A/7). These portions of these medical opinions do not support the degree of limitation alleged by the claimant, and these medical opinions are consistent with the medical evidence of record and observations, as discussed above.

In sum, the claimant's allegations are not entirely consistent throughout the record, and her allegations of disabling mental functional limitations are not entirely consistent with the medical evidence of record, including the examination findings and the persuasive portions of the medical evidence of record. While the record does not entirely support the extent of limitations the claimant has alleged, the record supports some degree of limitation from the claimant's impairments.

(*Id.* at 25-28.)

The Court finds substantial evidence supports the ALJ's determination that Herndon did not meet or equal a Listing.[3]  The ALJ thoroughly discussed the record evidence regarding Herndon's mental impairments at Step Three and in his RFC analysis.  As the ALJ's decision and this Court's review of the record makes clear, Herndon's mental health treatment records spanned only one year, and the medical findings within the treatment records are mixed.  Contrary to Herndon's allegation of cherry-picking, the ALJ highlighted the mixed findings in the record, including those supporting a finding of disability.  (Tr. 19-28.)  The ALJ provided a thorough, reasoned explanation throughout the decision as to how he weighed the evidence and resolved any conflicts.  (*Id.*)  Although the ALJ omitted an explicit discussion of Herndon's psychiatric hospitalization at Step Three, he discussed it in his RFC analysis.  (*Id.* at 25.)  *See Goddard v. Berryhill*, 1:16CV1389, 2017 WL 2190661, at *17 (N.D. Ohio May 1, 2017) ("Finally, although the ALJ's Listing 1.02A discussion at Step Three is brief, the ALJ made sufficient factual findings elsewhere in her decision to support her Step Three conclusion and to enable the Court to meaningfully review her decision.") (collecting cases), *report and recommendation adopted by* 2017 WL 2155391 (May 17, 2017).  Furthermore, the state agency reviewing psychologists, who had the benefit of the records of Herndon's hospitalization and the treatment notes from The Center for Families and Children on which Herndon relies, opined that Herndon did not meet or equal a listing.  (*Id.* at 76-80, 90-94.)

Herndon implies, although she does not explicitly argue, that the ALJ further erred in pointing to Herndon's lack of significant difficulty during the hearing as it "is analogous to the infamous 'sit-and-squirm' test which was rebuffed by the Sixth Circuit in *Weaver v. Sec'y of Health and Hum. Servs.*, 722 F.2d 310, 312 (6th Cir. 1983), where it was held that the ALJ must cite some other evidence for denying a claim in addition to his personal observations."  (Doc. No. 15 at 11.)  Contrary to Herndon's assertion, the

---

[3] Because the ALJ found Herndon did not meet the requirements of either Paragraphs B or C, the decision did not address the Paragraph A criteria of Listings 12.03, 12.04, and 12.06.

ALJ here complied with the mandate in *Weaver*; he not only cited his own observations of Herndon's behavior at the hearing – which the *Weaver* court recognized were "material, relevant, and admissible" (772 F. 2d at 312) – he cited and discussed numerous other factors in the record evidence he found supportive of his findings at Step Three.

In a single paragraph, Herndon asserts:

> This Southern District of Ohio has held that the ability to perform some activities on a limited basis is not substantial evidence that a claimant's symptoms were not disabling. *See Lorman v. Comm'r of Soc. Sec.*, 107 F. Supp. 3d 829, 838 (S.D. Ohio 2015). As in *Lorman*, the ALJ found that Herndon's ability to perform some activities meant she was not disabled. As such, this matter should be remanded for consideration of the totality of the evidence regarding Herndon's schizoaffective disorder and her limited ability to function.

(Doc. No. 15 at 12.)

It is unclear whether Herndon intends for this argument to apply to her Step Three argument, or her RFC argument. The Court finds Herndon waived this argument by failing to develop it. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.'") (citations omitted). It is not for this Court to develop Herndon's arguments for her.

After citing authority regarding when an ALJ's Step Three finding regarding a claimant's combination of impairments will be upheld, Herndon asserts, "In this matter, as set forth more fully above, the ALJ clearly did not consider the effect of the combination of Herndon's psychological impairments. This was harmful error requiring remand." (Doc. No. 15 at 13.) The Court likewise finds Herndon has waived this argument by failing to develop it.

It is well established that this Court's review is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's determination. *See e.g., Abbott*, 905 F.2d at 922. If substantial evidence supports the ALJ's determination that Plaintiff's

33

impairments did not meet or medically equal Listings 12.03, 12.04, and 12.06, this Court cannot reverse that determination, even if substantial evidence exists to the contrary. Here, for all the reasons set forth above, the Court finds substantial evidence supports the ALJ's determination that Herndon did not meet or equal the Paragraph B criteria for Listings 12.03, 12.04, and 12.06.

### 2.    RFC Analysis

Herndon argues the ALJ erred in crediting only certain portions of the state agency reviewing psychologists' opinions, disregarding the more restrictive limitations contained therein. (Doc. No. 15 at 12-13.) Herndon asserts this matter should be remanded for consideration of the entirety of the state agency reviewing psychologists' opinions. (*Id.*)

The ALJ weighed and analyzed the state agency reviewing psychologists' opinions as follows:

> As for the opinion evidence, the undersigned finds persuasive, portions the opinions of the state agency psychological consultants, Karla Delcour, Ph.D., dated July 3, 2017 (IA), and Robert Baker, Ph.D., dated September 8, 2017 (3A). They reviewed the claim at the initial and reconsideration level and Dr. Delcour opined that the claimant is able to understand and remember simple repetitive instructions; she is able to carry out simple repetitive instructions; she would likely perform optimally in a setting that entails minimal interaction; she can relate adequately on a superficial basis; and she can adapt to a setting in which duties are routine and predictable. (1A/8-10). Dr. Baker opined that the claimant is able to understand and remember 1-3 step instructions; she is able to concentrate sufficiently for the complete of 1-3 step tasks; she is able to work in a separate workspace with occasional superficial interactions with others; she may need occasional flexibility with breaks when experiences increased symptoms; she is able to work in a nonpublic setting with a small group that involves occasional and superficial interactions with others; supervisors should provide supportive and constructive feedback; and she is able to adapt to a setting in which duties are routine and predictable; she may need advance notice of major changes, which should be gradually implemented allowing her time to adjust to them. (3A/9-11). They opined further that the claimant has "moderate" limitation in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself (lA/6 and 3A/7). The undersigned finds portions of these opinions persuasive.
>
> The portions of doctors' opinions noting that the claimant would "likely perform optimally", that "supervisors should provide constructive feedback", she "may need" occasional flexibility with breaks, and "may need" advance notice of

major changes", are vague and otherwise outside of the scope of this analysis. The focus of this analysis is not the claimant's optimal functioning, and the portions noting that the claimant "may need" various accommodations are vague. Either the claimant requires the accommodation or she does not. The hedging does not provide clear functional limitations. Moreover, without a basis in the record to support these potential limitations, they are unpersuasive.

The record also does not support that she would be able to tolerate only occasional superficial interactions with others with whom she might interact in the work environment. The record supports that the claimant received psychiatric medication management and counseling at the time of her application for benefits until January of 2018. On March 24, 2017, while at the emergency department, the treating medical providers noted that she was alert, fully oriented, her mood and affect were normal, and she was no apparent risk to herself or others. (2F/5). On August 31, 2017, the nurse noted that the claimant was less angry and irritable than in past visits. (5F/25). At exam on September 28, 2017, she was calm, pleasant, and cooperative. (5F/21). On October 26, 2017, the claimant's affect was more full and bright, and she was more open with the provider. (5F/17). At exam on November 29, 2017, the claimant was calm, pleasant, and cooperative. (5F/13). On January 2, 2018, the nurse noted that the claimant's mood had improved with more stability since last medication change, and she continued to have visual hallucinations and anxiety. (5F/5). The record does not support that the claimant returned for any additional treatment or that she had any additional hospitalizations thereafter. While these examinations show that the claimant's mental impairments impact her ability to interact with others to some degree, they do not show a significant or serious degree of impairment. Despite the relatively stressful nature of the hearing, the claimant did not appear to have any difficulty interacting with counsel or the undersigned. (Hearing Observation). These is no evidence suggesting she could tolerate only superficial interactions with everyone.

The undersigned construes the balance of the doctor's specific mental functional limitations and assessment of the "paragraph B" criteria as substantially consistent with the limitations set forth in the above residual functional capacity assessment and *Paragraph B Criteria Analysis* (See infra Finding 3). These portions are also consistent with the medical evidence of record, including the aforementioned mental status examination findings. For these reasons, and based on this evidence, the undersigned finds portions of these opinions persuasive.

(Tr. 29-30.)

As non-treating sources, the ALJ owed no deference to the opinions of Drs. Delcour and Baker.

An ALJ is not required to give "good reasons" for rejecting a non-treating or non-examining opinion.

*Ackles v. Comm'r of Soc. Sec.*, 470 F. Supp. 3d 744, 753 (N.D. Ohio 2018) (citation omitted).

Furthermore, an ALJ is entitled to credit some parts of an opinion while rejecting other parts of it. *Black v. Comm'r of Soc. Sec.*, No. 5:11CV2770, 2012 WL 4506018, at *9 (N.D. Ohio Sept. 28, 2012) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006)).  Finally, an ALJ may assign less weight to an opinion for vagueness. *Ackles*, 470 F. Supp. 3d at 747 (citations omitted).

The ALJ considered and weighed the medical opinion evidence of record and provided an explanation for the weight assigned.  The ALJ determined that parts of Dr. Delcour's and Dr. Baker's opinions were vague and found those portions unpersuasive as a result.  (Tr. 29.)  Furthermore, the ALJ rejected the opinion that Herndon could only tolerate superficial interactions with others in a work environment, supporting his conclusions with citations to the record.  (*Id.* at 29-30.)  It is the ALJ's duty, not this Court's, to weigh the evidence and resolve any conflicts, and he did so here.

Although Herndon cites evidence from the record she believes supports a more restrictive RFC, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001).  Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  The ALJ clearly articulated his reasons for finding Herndon capable of performing work as set forth in the RFC and these reasons are supported by substantial evidence.  There is no error.

**B.    Second Assignment of Error**

In her second assignment of error, Herndon argues the ALJ erred at Step Five and "did not sustain his burden of proof" by rejecting portions of the state agency reviewing psychologists' opinions that "would have resulted in a finding of disability."  (Doc. No. 15 at 14-15.)  It is clear this portion of Herndon's Step Five argument is tied to her RFC argument above.  (*Id.* at 14) ("As stated above, the ALJ

36

erroneously disregarded the more restrictive limitations assessed by the State Agency reviewing psychologists.")  As the Court explained *supra*, there is no error in the ALJ's RFC analysis as a result of the ALJ's rejection of certain portions of the state agency reviewing psychologists' opinions.

Herndon also argues remand is required because the ALJ denied her attorney's request for a supplemental hearing or that interrogatories be issued.  Herndon asserts the ALJ based his denial of this request on the fact that he did not find a basis for a supplemental hearing but did not address the need for interrogatories.  (Doc. No. 15 at 15; Doc. No. 18 at 3.)  Herndon maintains the ALJ had sufficient time to request interrogatories or order a supplemental hearing, and the ALJ's refusal to do either "denied Herndon an opportunity for a full and fair hearing where all evidence was considered."  (Doc. No. 15 at 15.)

The Commissioner responds that Herndon's argument is "vague" and that she provides "little argument" in support of her contentions.  (Doc. No. 16 at 13.)  Regardless, the Commissioner's argues the ALJ addressed Herndon's attorney's post-hearing request and argumentation, and therefore "reasonably addressed counsel's request for a supplemental hearing based on a post-hearing vocational opinion and properly denied it."  (*Id.* at 14.)

The Sixth Circuit has acknowledged that due process principles apply to Social Security proceedings. *Robinson v. Barnhart,* 124 F. App'x 405, 410 (6th Cir. 2005).  Due process requires a social security hearing be "full and fair."  *Laddy v. Astrue,* No. 4:11-cv-293, 2012 WL 776551, at *11 (N.D. Ohio Feb. 2, 2012), *report and recommendation adopted by* 2012 WL 777137 (Mar. 8, 2012).  A claimant must have the opportunity to present all of the evidence, as well as confront the evidence against her.  *Id.* (*citing Flatfor v. Chater,* 93 F.3d 1296, 1306 (6th Cir. 1996)).  While there is not an absolute right to cross-examination for the development of a complete record, it should be available "where reasonably necessary to the full development of the case."  *Flatfor,* 93 F.3d at 1307.

On November 2, 2018, after the hearing, then-counsel for Herndon submitted a post-hearing brief arguing a supplemental hearing was necessary:

> Since the Claimant could not be reasonably expected to have known Your Honor's hypothetical assumptions before the hearing itself, and since the vocational expert in this case did not provide a report prior to the hearing, the vocational expert's testimony was "surprise testimony" which could not be reasonably prepared for in advance or, given the complexity of the vocational testimony, responded to immediately, without the ability to consult the vocational source materials relied upon by the vocational expert first.

(Tr. 223.)  Counsel also proffered "rebuttal vocational evidence" consisting of a vocational opinion by a Mr. Heckman.  (*Id.* at 224.)  Counsel then stated, "If the above does not convince Your Honor to issue a favorable decision, we respectfully submit that, at the very least, interrogatory questions to the vocational expert can resolve the issues raised above."  (*Id.* at 225.)

The ALJ addressed counsel's request as follows:

> On November 2, 2018, Counsel submitted a post-hearing brief with argument regarding additional functional limitations and an opinion from a purported vocational expert. (11E). In that brief, counsel alleges that Mr. Salkin's testimony was "surprise testimony", and counsel has requested a supplemental hearing in the absence of a fully favorable decision, based on this "surprise testimony". (11E/1).  There is no basis to support this assertion.  The Notice of Hearing sent to the claimant and her counsel on July 10, 2018, indicates the use of a vocational expert. (See 8B). Also, the request for vocational expert attendance at the hearing was sent on July 10, 2018, and made an exhibit in the file on that same date. (9B). Counsel and the claimant were on notice of the undersigned's intention and plan to use a vocational expert during the hearing for a period of greater than three months prior to the hearing. The claim that Mr. Salkin's testimony is "surprise testimony" has no basis in fact or law. It is based on Counsel's characterization alone. At the hearing, Counsel was provided the opportunity to cross-examine the vocational expert and ask all questions pertaining to matters he now claims are determinative in the case and requires supplemental testimony. Counsel has not established that Mr. Salkin's testimony was evidence that the claimant could not reasonably have anticipated. Counsel has also not identified what portion was a surprise to him. Such preparation is inherent in counsel's role in representing claimant's before the Administration. Counsel has not provided a good reason why he did not inquire into these issues and information with Mr. Salkin at the hearing. Counsel's failure to raise these issues during the hearing does not provide a basis to support a supplemental hearing. The undersigned has considered the post-hearing evidence and arguments counsel submitted regarding additional limitations and the vocational issues in this case.

38

> After considering that evidence, the undersigned does not find a basis to support a supplemental hearing. Accordingly, the request for a supplemental hearing is overruled.

(Tr. 15-16.)

For the following reasons, the Court finds the ALJ did not violate Herndon's due process rights by failing to follow *HALLEX* provisions relating to supplemental hearings.[4] To the extent Herndon asserts the ALJ failed to address her request to issue interrogatories to the vocational expert, she makes no argument as to why the ALJ's opinion cannot be read as determining no further testimony, either by way of a supplemental hearing or by interrogatory, was required.

Herndon's hearing counsel went into great depth and asked the VE several hypothetical questions. (Tr. 70-74.) Although the ALJ may have included (or excluded) certain limitations into his hypotheticals, or the VE may not have provided the responses Herndon wanted, these facts do not demonstrate Herndon was deprived of a "full and fair" hearing nor that such testimony was "surprise testimony" necessitating a supplemental hearing. Herndon offers no additional explanation here on judicial review showing she is entitled to a supplemental hearing. *HALLEX* does not require the ALJ to provide another hearing to Herndon because she failed to raise arguments or issues while at the hearing provided to her.

In addition, the ALJ considered the rebuttal vocational evidence in the form of Mr. Heckman's opinion at Step Five:

---

[4] With respect to vocational expert testimony, *HALLEX I-2-6-74* provides the "claimant and the representative have the right to question the VE fully on any pertinent matter within the VE's area of expertise." *HALLEX I-2-6-80* provides the framework in which a supplemental hearing is necessary. This section notes that a supplemental hearing is appropriate when: 1) certain testimony or a document takes the claimant by surprise, "is adverse to the claimant's interest, and presents evidence that the claimant could not reasonably have anticipated and to which the claimant is not prepared to respond;" 2) the ALJ believes additional testimony regarding the new issue is appropriate; 3) the ALJ, during the hearing, discovers that the testimony of additional person, who is not present, is needed; 4) the claimant or the ALJ wishes to present evidence, but cannot present it "without diminishing its probative value because of the absence of opportunity to for detailed examination or cross examination of the witness;" 5) an order or remand directs the ALJ to hold a supplemental hearing; 6) a request is made to cross-examine the author or provider of post-hearing evidence. This section of *HALLEX* further notes that "the ALJ should continue a hearing only if there is good reason to do so." *HALLEX I-2-6-80*.

Counsel for the claimant submitted a letter dated, [sic] including the opinion of a purported vocational expert, Mark Heckman, wherein Mr. Heckman opines that based on the same hypothetical assessed above, the claimant would not be able to return to perform any employment on a regular and consistent basis. (11E). The undersigned finds the testimony of vocational expert that testified at the hearing more persuasive. While counsel alleges that Mr. Salkin's testimony was surprise testimony, there is no basis to support this assertion. Counsel had the opportunity to cross-examine Mr. Salkin, and counsel is well-aware of the vocational experts' role and the nature of their participation in these proceedings. Mr. Salkin is qualified to render an expert opinion on vocational issues, he is impartial, and he provided a well-reasoned opinion.

(Tr. 32.)

With respect to any conflict between the testifying VE and the opinion by Mr. Heckman, as this district has stated:

[T]here is no requirement that the ALJ resolve conflicts between vocational evidence provided by either state agency employees or by other VEs. (Tr. 282-92, 489).  These are opinions, and thus can be weighed accordingly when reviewing the entirety of the record. Here, VE Mosley based her opinion upon a review of the record evidence and Plaintiff's testimony about her job duties and physical requirements; the ALJ was entitled to rely on her experience in concluding what job title most closely mirrored Plaintiff's past work.

*Harrington v. Comm'r of Soc. Sec.*, No. 1:14 CV 1833, 2015 WL 5308245, at *7 (N.D. Ohio Sept. 10, 2015).  Like Harrington, Herndon "cites to no authority which requires the ALJ to review, let alone resolve conflicts, between opinion evidence of the VEs or state employees." (*Id.*)  Nonetheless, the ALJ considered and weighed Mr. Heckman's opinion, and provided an explanation as to why he found the opinion by Mr. Salkin, the testifying VE, more persuasive.  (Tr. 32.)  There is no error.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date:  March 3, 2021                              *s/ Jonathan Greenberg*
                                                 Jonathan D. Greenberg
                                                 United States Magistrate Judge

40